1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOLITA MCCOY,
                    Plaintiff,

        v.

CAROLYN W. COLVIN,
                    Defendant.

Case No.  13-cv-02332-JSC

**ORDER GRANTING DEFENDANT'S
CROSS-MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

        Plaintiff Lolita McCoy ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405,

subdivision (g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the

Commissioner of the Social Security Administration ("Defendant" or "Commissioner"), denying

her disability benefits.  Now pending before the Court is Plaintiff's motion for summary judgment

and Defendant's cross-motion for summary judgment.  (Dkt. Nos. 12, 13.)  After carefully

considering the parties' submissions, the Court DENIES Plaintiff's motion for summary judgment

and GRANTS Defendant's cross-motion for summary judgment.

                                    **LEGAL STANDARD**

        A claimant is considered "disabled" under the Social Security Act if she meets two

requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be

severe enough that she is unable to do her previous work and cannot, based on her age, education,

and work experience "engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. § 423(d)(2)(A).  To determine whether a claimant is disabled, an

ALJ is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") on September 1, 2009. Plaintiff alleges that her disability began on February 17, 2009. The Social Security Administration ("SSA") denied her initial application and also on reconsideration. Plaintiff then timely filed a request for a hearing before an administrative law judge ("ALJ").

A hearing was held before ALJ Timothy Stueve on June 28, 2011 in Oakland, California. Testimony was given by Plaintiff, Plaintiff's mother Leola Buchanan, and vocational expert ("VE") Joanne Yoshioka. The ALJ issued a written decision denying Plaintiff's application. After the Appeals Council denied review on March 26, 2013, the ALJ's decision denying Plaintiff's application for a period of disability, SSI, and DIB, became the final decision of the Commissioner. Plaintiff subsequently brought the current action, seeking judicial review pursuant to 42 U.S.C. § 405(g).

## FACTUAL BACKGROUND

Plaintiff McCoy, now 54, underwent an elective craniotomy with resection of a left temporal meningioma on February 17, 2009. (AR 393.) There were no intraoperative or postoperative complications and Plaintiff was discharged from the hospital on February 20, 2009. (AR 393.) Plaintiff alleges disability stemming from this procedure. (AR 205.) Plaintiff previously worked as a receptionist, an operator, a medical billing clerk, and as a clerical assistant. (AR 60-62, 218.) She engages in the following daily activities: grocery shopping, watching

2

television, preparing meals on occasion, household chores, checking the mail, listening to music, reading and writing, and talking with friends and family on the phone.  (AR 72, 235-240.)

        **A.**    **Medical Evaluations**

                **1.**    **Dr. Patel, Dr. Dougherty, and Dr. Zemo**

Plaintiff presented to the Highland Hospital emergency department on January 13, 2009 complaining of ongoing headaches. (AR 379-80.)  An MRI showed that Plaintiff had a left temporal meningioma (benign brain tumor).  (AR 489.)  Elective surgery was scheduled for February 17, 2009 and Plaintiff was scheduled to visit the hospital for a clinic appointment at the end of January.  Plaintiff presented to the emergency department three days before the scheduled appointment complaining of headaches and requesting emergency surgery to remove the tumor. (AR 346.)  A medical report listing Drs. Atul Patel and Joseph Dougherty as Plaintiff's treating physicians indicated that Plaintiff was told at length that her condition was "non emergent," that the tumor was benign, and that the tumor would "not spread deeper into other tissue." (*Id.*)  The report further noted that Plaintiff appeared "extremely suspicious of medical personnel," that Plaintiff "remain[ed] dubious about the accuracy of the information offered to her," and that Plaintiff refused to take any of the medications offered to make her more comfortable and "slow the growth of the tumor." (*Id.*)  The report also indicated that Plaintiff had not been taking the drug Dilantin[1] as she was previously prescribed, and that it was recommended she take Ativan to control her anxiety.  (AR 347.)

Plaintiff attended her clinic appointment on February 4, 2009 to give her consent for the February 17, 2009 surgery.  (AR 406.)  Dr. Sessunu Zemo noted that Plaintiff was "noncompliant with any other medications that were prescribed, such as Dilantin and Ativan."  (AR 406.)  In an undated follow up appointment before Plaintiff's surgery, Plaintiff's treating physician indicated that Plaintiff was "encouraged and educated about the risks of not being compliant with her Dilantin, and [that Plaintiff] acknowledged those risks but did not intend on being compliant."

---

[1] Dilantin (Phenytoin) is a name brand anticonvulsant used to prevent seizures that may begin during or after brain surgery.  *See Phenytoin*, U.S. Nat'l Library of Med. Nat'l Institutes of Health (May 1, 2009), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html#brand-name-1.

United States District Court
Northern District of California

(AR 408.)  Plaintiff had successful surgery on February 17, 2009 and was prescribed the following medications: Decadron for inflammation, Vicodin elixir for pain, and Dilantin to prevent seizures. Following discharge, Plaintiff was scheduled for a follow up with the neurosurgery department on February 27, 2009 to determine her ability to return to work.  (AR 396.)   The record does not indicate what was discussed at this appointment.

Plaintiff met with Dr. Patel for an additional follow up on July 17, 2009.  (AR 343.)  Dr. Patel noted that he had previously prescribed Plaintiff the drug Elavil[2] after she presented to the emergency department on June 9, 2009 complaining of severe headaches.  (*Id.*)  Plaintiff told Dr. Patel that she "took one pill and didn't like it."  (*Id.*)  Dr. Patel also indicated that Plaintiff had many vague complaints such as headaches, memory difficulties, stiffness, and stress that were not explained by her surgical procedure.  (*Id.*)

### 2.   Dr. Sani

Plaintiff had two follow up MRI appointments in August 2009.  An MRI reviewed by Dr. Sani on August 4, 2009 showed no evidence "to suggest recurrent and/or residual tumor."  (AR 488.)  The results also showed "increased signal in the periventricular white matter" which the doctor opined "most likely represent chronic microvascular ischemia."  (*Id.*).

### 3.   Dr. Castro-Marie

Plaintiff's next MRI was performed on August 26, 2009.  Dr. Castro-Marie's neurosurgery progress notes from that visit report that Plaintiff was still complaining of head pain that was relieved by taking Ibuprofen.  The doctor noted that there was "no recurrence of tumor" and "scattered areas of high intensity in periventricular white matter."  (AR 342.)  Dr. Castro-Marie scheduled a follow up MRI to check for multiple sclerosis.  According to Plaintiff, Dr. Castro-Marie told her that the white spots on her brain were likely aging spots.  (AR 65, 304.)

### 4.   Dr. Lee

---

[2] Elavil (Amitriptyline) is a name brand drug that can be used to prevent migraine headaches.  *See Amitriptyline*, U.S. Nat'l Library of Med. Nat'l Institutes of Health (August 1, 2010), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html#brand-name-1.

4

United States District Court
Northern District of California

On October 10, 2009, Plaintiff had another MRI and Dr. Chung Lee concluded that Plaintiff did not have multiple sclerosis. (AR 490.) Dr. Lee indicated that there was "[n]o evidence of recurrent tumor" and "[m]ultiple foci of increasing intensity in the periventricular white matter on long TR images." (*Id.*) Dr. Lee noted that "[t]he size and number of the plaques appear stable when compared to the prior study dated August 4, 2009." (*Id.*) Plaintiff's medical records dated October 16, 2009 indicate that Plaintiff did not need to be referred to neurology because she was without symptoms. (AR 340.) The report noted limited range of motion in the cervical and lumbar spine, but no motor weakness and no sensory deficit. The report further noted that the MRI from October 10 showed "stable demyelinating plagues in periventricular white." (*Id.*) Plaintiff was scheduled for a follow up MRI in one year.

### 5. Physician's Assistant McDonald – January 2010 to August 2010

Plaintiff visited her primary care provider on January 25, 2010 complaining of abdominal girth, weight gain, and ongoing headaches. (AR 442.) She also complained of hiccups and nausea that were made better by eating. Plaintiff's Physician's Assistant, Shivaun McDonald, noted that Plaintiff's abdomen was "very firm, enlarged" and "quite tender throughout." (AR 443.) Ms. McDonald recommended scheduling a CT scan for Plaintiff's abdomen and pelvis as soon as possible. A CT scan performed on February 5, 2010 showed that her abdomen and pelvis were "basically normal except for [a] small stable liver lesion and [a] stable fibroid." (AR 441.) Ms. McDonald reported that Plaintiff stated her abdominal symptoms were made better by taking antacids such as Pepcid. (*Id.*)

Plaintiff left a telephone message at her primary clinic on April 7, 2010 stating that she went to the emergency room on April 2, 2010 with "throbbing pain in her brain" after completing her first day of physical therapy. (AR 439.) Physician's Assistant McDonald noted in her clinic progress report that Plaintiff received "a head CT which was negative," and that Plaintiff "was prescribed Dilantin which she did not get." (*Id.*) Plaintiff returned to her primary care clinic on April 26, 2010 and stated that her first physical therapy session caused her intense pain and that she did very little in her second session. (AR 438.) Plaintiff again refused any pain medication.

Plaintiff returned to Ms. McDonald on August 2, 2010 with "multiple head to toe complaints," but Ms. McDonald noted that "care [was] challenging/difficult" because Plaintiff was "reluctant to hear recommendations."  (AR 434.)

Ms. McDonald completed a medical source statement on August 26, 2010 signed by supervising physician Dr. Wolfsy indicating that Plaintiff suffered from a history of temporal meningioma, chronic post-surgery headaches, chronic pelvic pain, and uterine prolapse.  (AR 428.)  She opined that Plaintiff could not comfortably lie down and that Plaintiff would need breaks every 10 to 15 minutes if she were to return to work.  Ms. McDonald expressed that the only medication Plaintiff had taken was Ibuprofen, and that Plaintiff preferred no medication in general because she reported a history of past drug allergies.  (AR 429.)  She further noted that Plaintiff indicated physical therapy made her worse.

### 6.   Dr. Ghassemi

Plaintiff  had another MRI on June 2, 2010 which was read by Dr. Ghassemi and compared with the findings from her October 9, 2009 MRI.  (AR 455.)  Dr. Ghassemi found "[n]o evidence of residual or recurrent meningioma," and "[s]table supratentorial white matter disease which may be related to chronic small vessel ischemic disease or demyelinating disease."  (*Id.*)

### 7.   Dr. Acharya

Plaintiff visited the Neurology Clinic on July 26, 2010.  Dr. Acharya indicated that Plaintiff was still complaining of brain pain and other generalized body pains.  (AR 435.)  Plaintiff stated that she did not want any new medication without knowing if it was a different medication than previously given to her.  (*Id.*)

Dr. Acharya thereafter reviewed Plaintiff's follow up MRI on October 6, 2010 and noted that Plaintiff was still complaining of consistent pain at the surgery site.  (AR 430.)  Plaintiff reported feeling weak and dizzy, but stated that she had not suffered any seizures.  Dr. Acharya wrote that Plaintiff did not bring her medications as she was instructed, and that Plaintiff stated she was not willing to take the medications.  Plaintiff also did not believe Dr. Acharya when he told her that the white spots showing up on her MRI were present before her surgery.  (*Id.*)

United States District Court
Northern District of California

### 8.     Dr. Katzenberg

On January 10, 2010, Plaintiff saw neurological consultative examiner Dr. Daniel Katzenberg.  (AR 409-10.)  Dr. Katzenberg reviewed Plaintiff's medical record and conducted an examination.  He indicated that Plaintiff had obvious signs of surgery but that she "had no findings on exam, i.e. she is intact from a sensory motor standpoint."  (AR 410.)  He noted that the only issue was "head pain and poor sleep resulting from the head pain, which certainly could affect her ability to function during the day, primarily because of the relative sleep deprivation."  (*Id.*)  Dr. Katzenberg further indicated "[s]he is subjectively disabled by head pain and potentially cognitive impaired by poor sleep."  (*Id.*)  He opined that "[i]t might be worth having her see a psychologist to determine whether there is any cognitive dysfunction from the brain tumor or from the pain and sleep deprivation."  (*Id.*)  Dr. Katzenberg's functional capacity assessment concluded that Plaintiff had no physical restrictions.  He opined that from a neurological standpoint, there were "no physical restrictions other than those normally accorded to headaches, which, in this case, have an underlying organic basis."  (*Id.*)

### 9.     Dr. Reddy and Dr. Harar

On February 1, 2010, Plaintiff's record was reviewed by State agency consultant Dr. Reddy.  (AR 417.)  Dr. Reddy prepared a written Residual Functional Capacity ("RFC") and concluded that Plaintiff was less than fully credible.  He opined that Plaintiff's headaches were relieved by taking over the counter Ibuprofen and that Plaintiff was able to go out alone and handle her personal care.  He also noted that based on Plaintiff's activities of daily living, Plaintiff had no signs of concentration limitations.  Dr. Reddy indicated that Plaintiff did not allege any mental deficits due to her brain tumor, and that the evidence did not support "a possible, discrete mental impairment."  (AR 418-19.)  Dr. Reddy based this opinion on the activities of daily living reported by both Plaintiff and her mother.  He considered Plaintiff's ability to go out alone, her ability to concentrate without difficulties, her ability to follow written and spoken instructions, and her ability to handle finances and take medications without reminders.  (AR 419.)  Dr. Reddy recommended "RFC with hazard precautions" considering Plaintiff's potential for seizures. (AR

413, 415.)  He concluded that Plaintiff's "[h]eadache severity and frequency do not meet or equal any listing."  (AR 413.)

On July 19, 2010, State agency consultant Dr. Harar completed a written RFC for Plaintiff. (AR 421-27.)  Dr. Harar concluded that Plaintiff had no exertional limitations, but that she should avoid concentrated hazards.  Dr. Harar noted that Plaintiff complained of headaches but that her CT was negative.  She concluded that the denial of disability benefits for Plaintiff should be affirmed.  (AR 427.)

### 10. Physician's Assistant McDonald – February 2011 to December 2012

Plaintiff returned to her primary care clinic on February 24, 2011 complaining of ongoing head pain and an episode of sweating.  (AR 461.)  Ms. McDonald noted that Plaintiff had no interest in medication or manual treatment such as physical therapy.  Plaintiff saw Ms. McDonald again on April 11, 2011 reporting ongoing symptoms of frequent urination, feeling of tightness in epigastric skin after eating, empty feeling in the brain at the site of surgery after bowel movements, and headaches.  (AR 460.)  Ms. McDonald indicated that Plaintiff declined most every suggestion for relief from her symptoms including Nexium, physical therapy for headaches, osteopathic manipulative treatment for headaches, and medication for urinary symptoms.

### B. The Hearing

#### 1. Plaintiff's Testimony

At the hearing, Plaintiff testified that she suffers from persistent headaches that vary in intensity.  She explained that her headaches are particularly sharp when she becomes frustrated or "overwhelmed by something too active."  (AR 70.)  She stated that she believes her headaches are the result of a botched surgery.  (AR 65.)  When referring to white spots that showed up on her MRI, she indicated that her doctors "didn't want to admit that it was scar tissue damage injury. And that's exactly what it is."  (AR 65-66.)  She stated that she does not take her medications because she does not want to become addicted.  Plaintiff testified that she "tried at least one pill out of the prescription" and that it made her "feel like she was in a coma."  (AR 67.)  She further indicated that she does not suffer from depression or anxiety.  (AR 67.)

8

Plaintiff testified that she is able to read and write and do simple math; however, the pain and discomfort she feels routinely requires her to cut short any reading and writing.  (AR 58, 77.)  She leaves the house to grocery shop and enjoys listening to music, watching television, and reading and writing.  (AR 72.)  She estimated that she can stand for approximately 15 minutes before she gets exhausted and needs to lean on a counter to rest.  (AR 74.)

### 2.    Third-Party Testimony From Plaintiff's Mother, Leola Buchanan

Plaintiff's mother Leola Buchanan testified that Plaintiff suffers from pain and sleep deprivation since her February 2009 surgery.  (AR 80.)  She stated that Plaintiff has to sleep sitting up because the pain she experiences prevents her from lying down, and that before her surgery, Plaintiff was very active but has since had no social life.  (AR 81.)  Ms. Buchanan indicated that Plaintiff shops at the store close to their house, but that Plaintiff is slow and needs assistance to do regular grocery shopping.  Ms. Buchanan described an incident where Plaintiff came home and "slept like she was in a coma" after receiving a shot of pain medication at the hospital.  (AR 80-81.)  Ms. Buchanan opined that she did not believe Plaintiff suffers from depression.  (AR 82.)

### 3.    Vocational Expert's Testimony

The ALJ posed two hypotheticals to the VE at the hearing.  The first hypothetical described an individual who:

> could perform at all exertional levels, but who could never climb ladders, ropes, or scaffolds; who could frequently climb ramps or stairs, frequently balance, stoop, kneel, crouch, or crawl; who should avoid even moderate exposure to workplace hazards . . . due to the effects of pain or pain medication.

(AR 85.)  The VE opined that such an individual could perform Plaintiff's past work.  The second hypothetical asked, "[s]ame physical limitations as in the first, but the additional limitations of needing unscheduled breaks every 10 to 15 minutes; pain would frequently interfere with attention and concentration; and would miss more than three days of work per month."  (AR 86.)  The VE opined that such an individual could not perform any of Plaintiff's past work and could not perform any work that exists in the regional or national economy.  She further opined that the limitations posed – unscheduled breaks, three absences a month, and the inability to concentrate –

United States District Court
Northern District of California

would "[e]ach individually be preclusive to work."  (*Id.*)  All of these limitations were based on the medical source statement prepared by Physician's Assistant McDonald.  (AR 429.)

### 4. The ALJ's Decision to Hold the Record Open

At the conclusion of Plaintiff's hearing, Plaintiff discussed her refusal to take prescribed medications and her theory that the white spots showing up on her MRI were scar tissue caused by a botched surgery.  (AR 90-93.)  The ALJ explained that the opinions of Plaintiff's treating physicians were all contrary to Plaintiff's theory, but he agreed to keep the record open for 10 days to allow Plaintiff to provide a written statement from a treating physician attesting to her alternative theory.  In a written letter to the ALJ dated July 22, 2011, Plaintiff's counsel stated that he was unable to secure any additional evidence regarding Plaintiff's MRI results.  (AR 331.)

## C. The ALJ's Findings

After conducting the hearing and considering the testimony and evidence, the ALJ found Plaintiff not disabled under sections 223(d) and 1613(a)(3)(A) of the Social Security Act using the five-step disability analysis.  First, the ALJ found that Plaintiff met the SSA's insured status requirements through September 30, 2012 and had not engaged in substantial gainful activity since the alleged disability onset date.

Second, the ALJ determined that Plaintiff had two severe impairments: (1) history of temporal meningioma status post resection; and (2) headaches.  The ALJ did not reference any of Plaintiff's gastroenterological or genitourinary symptoms at step two.

Third, the ALJ found that Plaintiff did not have "an impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  (AR 21.)  The ALJ considered Plaintiff's impairments under listing 11.00 related to neurological conditions and found that "the medical evidence fails to support a finding that the claimant's medically determined impairments are attended by clinical findings which meet or medically equals the criteria for the listed impairments."  (AR 22.)  The ALJ concluded that this was the opinion of the State agency medical consultants with which he concurred.

Between the third and fourth steps, the ALJ considered Plaintiff's RFC and concluded that Plaintiff had the capacity to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: frequently climbing ramps and stairs; never climb ladders, ropes or scaffolds; frequent balancing, stopping, kneeling, crouching, and crawling; and avoid even moderate exposure to workplace hazards such as unprotected machinery and unprotected heights.

(AR 22.)

The ALJ considered all of the evidence from Plaintiff's testimony and treating physicians as well as the evidence from the consultative physicians and first determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 25.) However, the ALJ concluded that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (*Id.*) The ALJ found Plaintiff's pain testimony to be inconsistent with the objective medical evidence, her activities of daily living, and her refusal to follow medical advice. In making his RFC determination, the ALJ accorded "great weight to the opinion of the consultative examiner and the State agency medical consultant because their opinions [were] consistent with one another and with the medical evidence of record." (AR 25.) He accorded no weight to the opinion of Physician's Assistant McDonald because it "[was] based solely on subjective complaints and [was] not consistent with [Plaintiff's] refusal of any treatment or medications and [was] inconsistent with the negative objective and clinical findings." (AR 26.)

The ALJ then concluded at step four of the analysis that based on Plaintiff's RFC, Plaintiff was "capable of performing past relevant work as a clerical assistant, medical records clerk, and receptionist." (AR 26.) Having so concluded, he determined that she was not disabled under the Act.

**D.    The Appeals Council**

Plaintiff offered additional evidence to the Appeals Council for consideration of her claim. (AR 463-515.) While the Appeals Council considered this evidence, it concluded that the

11

evidence did not provide a basis to alter the ALJ's decision.  (AR 1-2.)  The factual record detailed above contains references to some of this additional evidence where necessary to provide an accurate timeline of Plaintiff's medical history.  A summary of the remaining relevant portions of this evidence follows.

### 1.    Letters from Physician's Assistant McDonald

On May 10, 2012 and again on December 11, 2012, Physician's Assistant McDonald wrote letters summarizing her opinion of Plaintiff's condition.  (AR 463-465.)  Ms. McDonald detailed Plaintiff's history of headaches which she opined affected Plaintiff's ability to sleep and carry out other daily activities such as reading, texting, talking, or laughing.  She also noted that Plaintiff suffered from abdominal fullness, pain, bloating, and nausea, that are "at least in part to irritation of the GI tract (gastritis) from her chronic Ibuprofen use."  (*Id.*)  Ms. McDonald continued that "Ms. McCoy reports multiple drug allergies/sensitivities so we are limited in our medication treatment options for this patient."  (*Id.*)  Finally, Ms. McDonald concluded that she believed that Plaintiff's symptoms "are quite disabling for her and could certainly affect her ability to maintain any kind of regular employment."  (AR 464.)

### 2.    Marital and Family Therapist Theimer

Plaintiff was referred by her primary care clinic to Marital and Family Therapist ("MFT") Svetlana Theimer of Behavior Health Care Services on May 8, 2012 and discharged on August 2, 2012.  (AR 508.)  Ms. Theimer diagnosed Plaintiff with adjustment disorder with depressed mood. Plaintiff's discharge criteria included findings of: "[n]o acute psychiatric symptoms or severe impairments in functioning, [n]o high suicide/violence risk or safety issues, [a]ble to make scheduled outpatient health care appointments, and [a]ble to maintain [activities of daily living]." (*Id.*)  Ms. Theimer indicated that Plaintiff "presented with difficulties in relationships" and "difficulties with chronic pain after brain surgery," but that Plaintiff "[was] doing better and stated that she expressed everything and [was] ready to stop therapy."  (AR 509.)

### 3.    Abdominal Examinations by Dr. Mantuani

Plaintiff underwent an ultrasound of her abdomen on November 18, 2012 which was reviewed by Dr. Mantuani.  (AR 496.)  Dr. Mantuani noted that the ultrasound was negative for any acute findings.  The notes read: "[n]othing identified on exam or lab analysis that indicates need for immediate medical or surgical intervention."  (AR 496.)  Plaintiff underwent a CT scan of her abdomen and pelvis on December 4, 2012 which was unremarkable except for fibroids in her uterus that had progressively increased in size since 2008.  (AR 493.)

**STANDARD OF REVIEW**

Pursuant to 42 U.S.C. section 405(g), the Court has authority to review the ALJ's decision to deny benefits.  When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallenes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). The Ninth Circuit defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;" it is "more than a mere scintilla, but may be less than a preponderance."  *Molina*, 674 F.3d at 1110-11 (internal citations and quotations omitted); *Andrews*, 53 F.3d at 1039.  To determine whether the ALJ's decision is supported by substantial evidence, the reviewing court "must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (internal citations and quotations omitted);  *see also Andrews*, 53 F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.").

Determinations of credibility, resolution of conflicts in medical testimony and all other ambiguities are roles reserved for the ALJ.  *See Andrews*, 53 F.3d at 1039;  *Magallenes*, 881 F.2d at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and quotations omitted); *see also Batson v. Commissioner*, 359 F.3d 1190, 1198 (9th Cir. 2004)

13

United States District Court
Northern District of California

("When the evidence before the ALJ is subject to more than one rational interpretation, we must

defer to the ALJ's conclusion."). "The court may not engage in second-guessing." *Tommasetti*,

533 F.3d at 1039. "It is immaterial that the evidence would support a finding contrary to that

reached by the Commissioner; the Commissioner's determination as to a factual matter will stand

if supported by substantial evidence because it is the Commissioner's job, not the Court's, to

resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08-CV-00147-BAK, 2009 WL

3112321, at *4 (E.D. Cal. Sept. 23, 2009). Similarly, "[a] decision of the ALJ will not be reversed

for errors that are harmless. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

### DISCUSSION

Plaintiff has presented two theories for remand. First, Plaintiff contends that the ALJ's

RFC determination was in error because he improperly discounted the opinion of her "treating

source" and erred in discounting Plaintiff's pain testimony such that remand for an award of

benefits is appropriate. Alternatively, Plaintiff contends that the ALJ erred in failing to develop

the record by not ordering a psychological examination or calling a medical expert, and that new

evidence presented to the Appeals Council merits remand for a new hearing. Neither theory is

persuasive as discussed below.

**A.      The ALJ's RFC Determination**

In finding that Plaintiff had the residual functional capacity to perform her past relevant

work, the ALJ accorded great weight to the opinions of consultative examiner Dr. Katzenberg and

"the State agency medical consultant because their opinions [were] consistent with one another

and with the medical evidence of record." (AR 25.) The ALJ subsequently accorded no weight to

the opinion of Physician's Assistant McDonald. He also discounted Plaintiff's subjective pain

testimony with respect to the intensity, persistence and limiting effects of her symptoms. The

Court will address each of these assessments in turn.

**1.      The ALJ's Consideration of the Medical Evidence**

Following Plaintiff's initial MRI and subsequent surgery, Plaintiff underwent five follow

up MRIs that her treating physicians concluded were unremarkable. Dr. Patel, who performed

14

Plaintiff's surgery, noted that there were no complications, and that Plaintiff's subsequent reports of pain were inconsistent with her procedure.  The ALJ ultimately concluded that none of the objective medical evidence supported Plaintiff's subjective statements of pain.  In determining Plaintiff's RFC, the ALJ relied heavily on the medical record and the opinions of the consultative examiner and State medical consultant.  Plaintiff contends that the opinion of her Physician's Assistant should also have been considered.

### (a)    The Standard for Weighing Medical Evidence

The Ninth Circuit has "developed standards that guide our analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Specifically, a reviewing court must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of each is accorded a different level of deference, as "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician."  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

### (b)    The ALJ Did Not Err in Assigning No Weight to the Opinion of Physician's Assistant McDonald

Plaintiff does not challenge the ALJ's decision to give more weight to the opinions of consultative examiner Dr. Katzenberg and the two State agency medical consultants; instead, she takes issue with the ALJ's decision to give no weight at all to Physician's Assistant McDonald.  Plaintiff argues that if Ms. McDonald's opinion were credited as true, the ALJ would have been compelled to find Plaintiff disabled at step five.  Specifically, Physician's Assistant McDonald opined that if Plaintiff returned to work, she would need to take unscheduled breaks every 10 to 15 minutes and would likely be absent more than three times per month due to her impairment.  (AR 429.)  She also reported that Plaintiff frequently suffers from pain that is severe enough to interfere with attention and concentration.  (*Id.*)  The second hypothetical posed to the VE adopted

United States District Court
Northern District of California

these limitations and the VE found each of the limitations preclusive to work and opined that a person suffering from all three limitations would be unable to perform any work that exists in the national economy.  The ALJ did not consider this hypothetical in making his RFC determination because he gave no weight to the opinion of Physician's Assistant McDonald, finding that it was based "solely on subjective complaints and is not consistent with the claimant's refusal of any treatment or medications and it is inconsistent with the negative objective and clinical findings." (AR 26.)

The relevant SSA regulations state that "[o]nly physicians and certain other qualified specialists are considered [medically acceptable treating sources.]" *Ghanim v. Colvin,* No. 12-35804, 2014 WL 4056530, at *5 (9th Cir. Aug. 18, 2014) (internal citations and quotations omitted);  20 C.F.R. §§ 404.1513(a), 404.1513(d).  "Physician's assistants are defined as "other sources . . . and are not entitled to the same deference [as medically acceptable treating sources.]" *Molina*, 674 F.3d at 1111.  Although the ALJ did not state that he discounted Ms. McDonald because of her status as a physician's assistant, he was free to do so because there was no evidence that she worked under a physician's close supervision.  *See id.* (physician's assistant was not a medically acceptable treating source because there was no evidence she worked under a physician's close supervision);  *see also Mack v. Astrue*, 918 F.Supp.2d  975, 983-984 (N.D. Cal. 2013) (refusing to elevate the opinion of a social worker to acceptable medical source status because there was no evidence she had a close supervisory relationship with a physician); *Ramirez v. Astrue*, 803 F.Supp.2d 1075, 1082 (C.D. Cal. 2011) (physician's signature on client plan prepared by a social worker did not establish that the social worker worked under the physician's close supervision while treating claimant or preparing reports, and therefore social worker was not an acceptable medical source).  Here, Physician's Assistant McDonald's opinion is memorialized in a medical source statement signed off by a Dr. Wolfsy, and two letters dated in 2012 signed only by Ms. McDonald.  (AR 428-429, 463-465.)  This evidence standing alone does not establish that Physician's Assistant McDonald "worked so closely with an acceptable medical source that she was effectively its agent."  *Mack*, 918 F.Supp.2d at 983.

16

1    The ALJ must still evaluate the opinions from physician's assistants and "other sources,"

2    but "may discount the opinion of these 'other sources' if the ALJ gives "reasons germane to each

3    witness for doing so." *Ghanim*, 2014 WL 4056530, at *5. Here, the ALJ indicated that he

4    accorded no weight to the opinion of Ms. McDonald because "it is based solely on subjective

5    complaints and is not consistent with [Plaintiff's] refusal of any treatment or medications and it is

6    inconsistent with the negative objective and clinical findings." (AR 25-26.) Substantial evidence

7    supports the ALJ's reasons for discounting Ms. McDonald's opinions.

8    First, all of the limitations that Physician's Assistant McDonald ascribed to Plaintiff in her

9    2010 medical source statement were predicated on recitations of Plaintiff's subjective reports of

10   pain. *See, e.g.*, AR 428 ("pain in head travels to neck, back, temporal region of head," "very little

11   relief"); AR 429 ("physical therapy 'made her worse'.") Ms. McDonald's 2012 letters likewise

12   described Plaintiff's symptoms as reported by Plaintiff. *See, e.g.*, AR 463 ("chronic daily

13   headaches as well as complaints of a sensation of extreme pressure in her head ("brain") which is

14   very distressing to her," "affects her sleep quality and sense of well being.") An ALJ is free to

15   discredit even the opinion of a treating physician if the opinion "is based to a large extent on a

16   claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at

17   1041 (internal citations and quotations omitted). Ms. McDonald provided "little independent

18   analysis or diagnosis" and failed to reconcile Plaintiff's subjective complaints with the negative

19   findings in Plaintiff's medical record.[3]  *See id; see also* AR 343 (complaints inconsistent with her

20   surgical procedure); AR 342, 455, 488, 490 (no evidence of recurrent or residual tumor); AR 340

─────────────

21   [3] Further, Ms. McDonald's 2012 opinion letters are inconsistent with other evidence in the record.

22   (AR 463-465.)  The letters state that medication treatment options were limited because Plaintiff
     reported multiple drug allergies; however, none of Plaintiff's treating physicians noted any reports

23   of drug allergies.  In fact, the allergy spaces on Plaintiff's periodic Medical Clinic Process Reports
     from the Alameda County Medical Center indicate either no allergy or allergies to shellfish and

24   chocolate.  AR 430-446.  Ms. McDonald's treatment notes are likewise devoid of any reference to
     drug allergies on Plaintiff's behalf.  Moreover, Plaintiff stated at her hearing that the reason she

25   did not take any of her medications was because she did not want to become addicted.  Indeed,
     Plaintiff could only remember taking one pill over the course of her treatment, which is consistent

26   with her treating physicians' notes.

27                                                    17

28

United States District Court
Northern District of California

(no motor weakness or sensory deficits and  referral to neurology not needed because she was without symptoms); AR 342 (head pain relieved by taking Ibuprofen); AR 441 (abdomen/pelvis CT scan "basically normal except for small liver lesion and stable fibroid"); AR 430 (Plaintiff stated she had not suffered any seizures); AR 508 ("[n]o acute psychiatric symptoms or severe impairments in functioning"); AR 493 (CT scan of abdomen and pelvis unremarkable except for fibroids in uterus); AR 496 (ultrasound negative for any acute findings); AR 410 ("no findings on exam i.e. she is intact from a sensory motor standpoint"); AR 418 ("[activities of daily living] report no concentration or limitations in following instructions . . . NEURO CE . . . indicates claimant is well capable of answering questions").

Second, several of Plaintiff's treating physicians reported that Plaintiff refused to take her prescribed medications and refused any recommendations to manage her pain.  Ms. McDonald similarly noted that Plaintiff refused all recommendations during the course of her treatment.  *See* AR 434 (noting that care was challenging and difficult because Plaintiff was "reluctant to hear recommendations"); AR 438 (noting that Plaintiff refused a trial of Neurontin); AR 461 (Plaintiff had "no interest in other medical treatment or manual treatment" such as physical therapy); AR 460 (Plaintiff "declined most every suggestion for symptoms including Nexium, physical therapy for headaches, osteopathic manipulative treatment for headaches, and medication for urinary symptoms").  As discussed in more detail below, the "case law is clear that if a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated."  *Orn*, 495 F.3d at 638; *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (noting that an ALJ may discount a claimant's subjective pain testimony when there is evidence of an unexplained or inadequately explained failure to follow prescribed treatment options).

    **(c)**       **The ALJ Did Not Err in Failing to Consider the Second Hypothetical**

The Court next turns to the second hypothetical posed to the VE.  "[T]he ALJ can call upon a [VE] to testify as to: (1) what jobs the claimant, given his or her [RFC], would be able to do; and (2) the availability of such jobs in the national economy."  *Tackett*, 180 F.3d at 1101.

18

United States District Court
Northern District of California

"The testimony of a [VE] is valuable only to the extent that it is supported by medical evidence" and has "no evidentiary value if the assumptions in the hypothetical are not supported by the record." *Garrison*, 759 F.3d at 1011 (internal citations and quotations omitted).  Here, the assumptions in the second hypothetical were drawn only from the opinion of Ms. McDonald. Accordingly, because the Court has concluded that her opinion was not supported by the record, the ALJ was not required to consider the second hypothetical in making his step-four determination.

### 2.   The ALJ's Consideration of Plaintiff's Subjective Pain Testimony

As noted above, the ALJ did not find Plaintiff's subjective reports of pain credible to the extent that they "[were] inconsistent with the . . . residual functional capacity assessment."  (AR 25.)  The SSA policy on determining RFC directs ALJs to give "[c]areful consideration . . . to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone."   SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996).  If the record establishes the existence of an impairment that could reasonably give rise to such symptoms, the "ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006);  *see also Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012) ("Because the RFC determination must take into account the claimant's testimony regarding his capability, the ALJ must assess that testimony in conjunction with the medical evidence.").

### (a)   The Standard for Assessing Credibility

"An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible."  *Garrison*, 759 F.3d at 1014.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotations omitted).  "Second, if the claimant meets this first test, and there is no evidence of malingering,

19

the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotations omitted). However, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair*, 885 F.2d at 603. Most commonly, a claimant's credibility is called into question where his or her complaint is about "disabling pain that cannot be objectively ascertained." *Orn*, 495 F.3d at 637.

Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 25.) In making this determination, the ALJ did not find that Plaintiff was malingering; he thus was required to set forth specific, clear and convincing reasons for rejecting Plaintiff's pain testimony. *See Lingenfelter*, 504 F.3d at 1036. "In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

Here, the ALJ explained his adverse credibility finding by referring to (1) Plaintiff's negative brain MRI and CT scans and lack of clinical evidence supporting allegations of pain; (2) Plaintiff's refusal to follow medical advice including taking prescribed medications and participating in physical therapy and her ability to obtain temporary pain relief through over-the-counter medication; and (3) Plaintiff's activities of daily living as reported at her hearing and in her written reports and inconsistencies between the two regarding her ability to concentrate, follow directions, and complete tasks. (AR 25.)

Although subjective pain testimony that is not fully corroborated by objective medical evidence is relevant in determining the severity of Plaintiff's pain and its disabling effects, it

United States District Court
Northern District of California

cannot be the sole reason to discredit Plaintiff's subjective complaints of pain. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Lingenfelter*, 504 F.3d at 1036. Thus, the Court must consider the ALJ's other reasons for rejecting Plaintiff's subjective reports of pain beyond the lack of corroborating clinical evidence.

### (i)      *Plaintiff's Refusal to Follow Medical Treatment Options*

An "ALJ may properly rely on unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (internal quotation marks and citation omitted); *see also* 20 C.F.R. §§ 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . . ."); SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996) ([T]he individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). "In the case of a complaint of pain, such failure may be probative of credibility, because a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief." *Orn, 495 F.3d* at 638. However, "[w]here a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so." *Smolen*, 80 F.3d at 1284; *see also* 20 C.F.R. § 404.1530(c), 416.930(c); SSR 96-7p, 1996 WL 374186, at *8.

As noted above, the record is rife with examples of Plaintiff refusing to follow prescribed treatment options to relieve her symptoms. Plaintiff admitted at her hearing that she only took one prescribed pill and refused to take all others. She also refused all recommendations for more conservative treatment options such as physical therapy and osteopathic manipulative treatment. Further, she only attended two physical therapy sessions and "did very little" in the second session. (AR 438.) The record also indicates that she did receive some relief from the over-the-counter drug Ibuprofen. *See Parra v. Astrue*, 481 F.3d 742, 751-52 (9th Cir. 2007) (evidence that physical ailments were treated with over-the-counter medication "is sufficient to discount a claimant's testimony regarding severity of an impairment"). Finally, the only evidence Plaintiff

offered as to why she refused to take pain medications was that she did not want to become addicted and did not like the way she felt after taking one pill.  Thus, "[w]hile an ALJ may not reject symptom testimony where a claimant provides evidence of a good reason for not taking medication, [P]laintiff has not presented such a sufficient reason." *Ritchie v. Astrue*, No. 12-311, 2012 WL 3020012, at *5 (C.D. Cal. July 24, 2012) (claimant's refusal of pain medication because the claimant "did not like" narcotics and preferred over-the-counter medication was not a sufficient reason to refuse to follow prescribed treatment); *see also Galvan v. Astrue*, No. 11-7260, 2012 WL 952414, at *6 (C.D. Cal. March 21, 2012) (claimant's decision to decrease dose of prescribed medication and explanation that she was "afraid to increase" the dose was not a sufficient reason to refuse to follow prescribed treatment).  Accordingly, "[a]lthough [Plaintiff] provided reasons for resisting treatment, there was no medical evidence that [Plaintiff]'s resistance was attributable to [a medical reason] rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment [was] inconsistent with the level of complaints.'" *Molina*, 674 F.3d at 1114.

***(ii)***      ***The ALJ Properly Considered Plaintiff's Activities of Daily Living***

When evaluating credibility, an ALJ may consider "the claimant's daily activities."  20 C.F.R. §§ 404.1529(c)(3)(i), 416.919(c)(3)(i);  *Smolen*, 80 F.3d at 1284; *see also Fair*, 885 F.2d at 603 (stating that the claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation incredible.").

> [T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

*Molina*, 674 F.3d at 1113 (internal citations and quotation marks omitted).

Plaintiff does not specifically challenge the ALJ's finding that her activities of daily living are inconsistent with a complete inability to work.  The Court finds that in any event such a challenge would be unavailing.  The ALJ accurately detailed Plaintiff's activities of daily living and provided a specific, clear and convincing account of how those activities contradict the

22

United States District Court
Northern District of California

severity of Plaintiff's impairments.  The ALJ noted Plaintiff's "ability to care for her personal needs, though at a slower pace."  (AR 25.)  He described Plaintiff's ability to "prepare simple meals, do laundry, clean the bathroom and bedroom, . . . wipe down the stove and counter tops after eating," . . . and grocery shop for necessities.  (*Id.*)  He concluded that Plaintiff's alleged concentration difficulties were contradicted by Plaintiff's written reports where she indicated that she "could pay attention with no problem, could follow written and spoken instructions very well, and could finish what she started."  (*Id.*)  While some of the activities the ALJ recounted are performed with difficulty or require rest, they are still "grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina*, 674 F.3d at 1113; *see also Fair*, 885 F.2d at 603 (holding that "if despite . . . claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working").  Thus, the Court concludes that substantial evidence supports the ALJ's decision to discount Plaintiff's subjective pain testimony based on her activities of daily living.

> **(b)** **The ALJ's Failure to Consider the Testimony of Plaintiff's Mother Was Harmless**

Plaintiff contends that the ALJ erred by not referencing how statements by Plaintiff's mother Leola Buchanan corroborated Plaintiff's inability to work.  Lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence. *Molina*, 674 F.3d at 1114 (ALJ must "consider testimony from family and friends submitted on behalf of the claimant" but does not need to "provide express reasons for rejecting testimony from each lay witness").  In assessing Plaintiff's RFC, the ALJ listed Plaintiffs reported activities of daily living and made no reference to the testimony of Plaintiff's mother Leola Buchanan or her third party function report.  Ms. Buchanan's written report and testimony, however, do not describe any limitations beyond what Plaintiff described.  The responses Ms. Buchanan provided in her third party function report are consistent with Plaintiff's answers in all material respects.  Similarly, she testified about Plaintiff's pain and sleep deprivation, her inability to sleep lying

23

down, her ability to walk to the local store to buy necessities, and her slow pace while doing regular grocery shopping. (AR 80-82.)  The ALJ considered all of these limitations in assessing Plaintiff's RFC.

To the extent that the ALJ rejected Ms. Buchanan's statements because they were inconsistent with a finding that Plaintiff was totally unable to work, the ALJ's failure to provide germane reasons is harmless error because Ms. Buchanan's statements are substantially the same as Plaintiff's.  *See Molina*, 674 F.3d at 1122 ("Because the ALJ had validly rejected all the limitations described by the lay witnesses in discussing Molina's testimony, we are confident that the ALJ's failure to give specific witness-by-witness reasons for rejecting the lay testimony did not alter the ultimate nondisability determination. Accordingly, the ALJ's error was harmless.") Ms. Buchanan's testimony is consistent with Plaintiff's and does not describe any limitations beyond what Plaintiff described – which the ALJ discussed and rejected by giving clear and convincing reasons, as discussed above.

**B.      Plaintiff's Alternative Theory**

    **1.      The ALJ Was Not Required to Further Develop the Record**

Plaintiff also contends that the ALJ derogated his duty to further work up the record to determine whether she suffers from a mental impairment.  Plaintiff argues that this duty also required the ALJ to call a medical expert because "the ALJ seemed confused by the MRI findings" (Dkt. No. 12 at 6:20) and did not "adequately explain his decision that [P]laintiff did not meet or equal a listing level impairment."  (*Id.* at 6:17-18.)

Only if evidence in the record is inadequate or ambiguous to allow proper evaluation of a mental impairment, does "[t]he ALJ . . . [have] an independent duty to fully and fairly develop the record . . . ." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that the ALJ failed to develop the record when he relied heavily on the opinion of a non-examining medical expert to find that the claimant suffered from a mild mental impairment, but ignored the same expert's opinion that conflicting treating physicians reports rendered the record ambiguous as to the possibility of more serious mental impairments such as chronic schizophrenia or depressive

24

disorder).  The ALJ can discharge this duty in several ways, including by: (1) making a reasonable attempt to obtain medical evidence from the claimant's physician(s); (2) ordering a consultative examination when the medical evidence is incomplete or unclear; (3) subpoenaing or submitting questions to the claimant's physicians; (4) continuing the hearing; or (5) keeping the record open for more supplementation.  *See Tonapetyan*, 242 F.3d at 1150; 20 C.F.R. §§ 404.1512, 404.1517.

### (a)         The ALJ Did Not Err In Failing to Order a Psychological Examination

Plaintiff argues that the ALJ erred by failing to send her for a psychological examination in light of (1) Dr. Katzenberg's statement that "[i]t might be worth having her see a psychologist to determine whether there is any cognitive dysfunction from the brain tumor or from the pain and sleep deprivation" (AR 410) and (2) "the evidence that establishes a 'colorable' claim of a mental impairment" (Dkt. No. 12, 6:6-8.)  This "evidence" appears to be a 2010 statement by Dr. Acharya that Plaintiff likely had paranoia, which was made after Plaintiff adamantly disagreed with the doctor's explanation of the white spots showing up on her brain scan (AR 430), and her mother's testimony that there had been a dramatic change in her daughter since the surgery.  (AR 79.)  The Court disagrees that either Dr. Katzenberg's statement or this "evidence" created an ambiguity mandating that the ALJ send Plaintiff for a psychological exam.

First, Plaintiff bears the burden of proving that she suffers from "any impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities."  *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 416.920(c)).  To establish a mental impairment, Plaintiff must present evidence of signs, symptoms, and laboratory findings that establish the existence of a mental impairment.[4]  *See* 20 C.F.R. §§ 404.1508, 404.1528(a), 416.908.  Here, Plaintiff never alleged disability based on mental impairment, nor is there evidence in the record of any signs, symptoms, or laboratory

---

[4] A medical "sign" is "an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques . . . ." *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 (9th Cir. 2005) (quoting SSR 96–4p, 1996 WL 374187, at *1 n.2 (July 2, 1996)). A "symptom" is "an individual's own perception or description of the impact of his or her physical or mental impairment(s) . . . ." *Id*; *see also* 20 C.F.R. §§ 404.1528(a)-(b), 416.928(a)-(b).

United States District Court
Northern District of California

findings indicating that Plaintiff suffered from a mental disorder.  (AR 160-168; 204-211.)
Unlike in *Tonapetyan*, where the ALJ's duty to develop the record was triggered by an expert's
uncertainty regarding conflicting diagnoses of mental disorders, here, there is an absence of any
evidence suggesting that Plaintiff suffered from a mental impairment.  *See Tonapetyan*, 242 F.3d
at 1149-1151.  Neither Dr. Katzenberg nor Dr. Archaya's statements created an ambiguity or
uncertainty in the record as Plaintiff never alleged that she had a mental impairment or cognitive
issues.   Rather, at her hearing before the ALJ, Plaintiff contended that the white spots on her MRI
were scar tissue, although Plaintiff had not offered any medical evidence to this effect.  (AR 91-
93.)  The ALJ discharged his duty to resolve any uncertainty in this regard by holding the record
open for 10 days to allow Plaintiff to supplement the record.  (AR 93.) Plaintiff's counsel
subsequently wrote the ALJ stating that he had been unable "to secure any additional evidence
regarding Ms. McCoy's MRI results."  (AR 331.)  There was no discrepancy regarding whether
Ms. McCoy suffered from a mental impairment, as she did not allege any such impairment nor did
her "treating source" Ms. McDonald opine that she had a mental impairment.

Second, the weight of the evidence in the record suggests that Plaintiff did not suffer from
a mental impairment.  State agency consultant Dr. Reddy noted that based on Plaintiff's activities
of daily living, Plaintiff had no signs of concentration limitations.  Dr. Reddy concluded that the
evidence did not support "a possible, discrete mental impairment."  (AR 419.)  Dr. Reddy based
this opinion on the activities of daily living reported by both Plaintiff and her mother.  In reaching
this opinion, Dr. Reddy considered Plaintiff's ability to go out alone, her ability to concentrate
without difficulties, her ability to follow written and spoken instructions, and her ability to handle
finances and take medications without reminders.  Dr. Katzenberg likewise noted that Plaintiff's
coordination was smooth, her gait was normal, and that she was "intact from a sensory motor
standpoint."  (AR 410.)  Plaintiff and her mother also both testified that Plaintiff did not suffer
from anxiety or depression.  (AR 67, 82.)  Further, although Plaintiff has now seized on two
doctor's notes which state that she was likely paranoid about the opinions of medical staff,
Plaintiff's treating physicians never found that Plaintiff suffered from any disabling mental

26

impairment as a result of her surgery.  *See e.g.* AR 340 ("no motor weakness, no sensory deficit"); AR 347 ("[p]atient alert and oriented . . . [s]he speaks in full sentences without any difficulty with word recognition or finding"); AR 495 ("speech clear, oriented X 3, normal affect, responds appropriately to questions").   Finally, the additional evidence Plaintiff submitted to the Appeals Council indicates that in 2012, MFT Theimer diagnosed Plaintiff with adjustment disorder and depressed mood but discharged Plaintiff with the following criteria: "[n]o acute psychiatric symptoms or severe impairments in functioning" and "[a]ble to maintain [activities of daily living]."  (AR 508.)

This is not a case where the plaintiff contended that she had a mental impairment and the evidence was unclear; nor is it a case where one of the treating or consulting physicians opined that the plaintiff had a mental impairment.  *See Hilliard v. Barnhart*, 442 F. Supp. 2d 813, 817 (N.D. Cal. 2006) and *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991).  Thus, the ALJ was not required to consider Plaintiff's alleged psychological issues, and was correct to consider only those impairments Plaintiff alleged in her application for disability benefits— headaches occurring after surgical removal of a benign brain tumor.  (AR 205.)

    **(b)**        **The ALJ Was Not Required to Call a Medical Expert**

Plaintiff also takes issue with the ALJ's step three explanation and argues that consultation with a medical expert was required because the ALJ "had some disagreement with the MRI, claimant's medications, and objective medical evidence, but did not consult with a medical source regarding the reading of the MRI or any of these other questions that were in his mind."  (Dkt. No. 12, 6:22-25.)  The "disagreement regarding the reading of the MRI" that Plaintiff cites was a discussion at the administrative hearing where the ALJ made the following statements regarding the white spots on Plaintiff's brain MRI:

> ATTY: I understand. And I'm also looking at the MRI results. They show the white matter --
> ALJ: Right. Which the neurologist said is age.
> ATTNY: Right.
> ALJ: And I know the claimant disagrees with that, but I don't have a doctor that disagrees with that yet. . . .
> ATTNY: Well it just said possibility of chronic, small --
> ALJ: Right. . . . .

27

1          ALJ: But there are no corroborating symptoms --

2    (AR 91.)  This discussion does not indicate that the ALJ had any disagreement with Plaintiff's

3    MRI results; rather, the ALJ provided an accurate summary of the objective medical evidence.

4    Similarly, the ALJ never equivocated over the evidence concerning Plaintiff's medications and

5    only raised questions as to why Plaintiff refused to take them. (AR 66-67, 70, 81, 83, 90-91.)

6    None of these comments from the ALJ indicate that the record was ambiguous; nor do they

7    indicate that he felt the record was inadequate such that a duty to develop the record with a

8    medical expert was triggered.  *See Tonapetyan*, 242 F.3d at 1150.  The ALJ nevertheless gave

9    Plaintiff the opportunity to supplement the record with additional evidence regarding her MRI

10   results, but as discussed above, Plaintiff did not do so.

11          With regard to the ALJ's step-three determination, the ALJ indicated that he relied on the

12   opinions of the State agency medical consultants who all provided documentation opining that

13   Plaintiff's severe impairments did not meet or equal a listed impairment.  (AR 21-22.)

14   Documentation from State agency medical consultants opining on the issue of equivalency is

15   received into the record as expert opinion evidence.  *See* SSR 96-6p, 1996 WL 374180, at *3 (July

16   2, 1996) ("The signature of a State agency medical . . . consultant on [various forms reporting their

17   findings] ensures that consideration by a physician . . . designated by the Commissioner has been

18   given to the question of medical equivalence at the initial and reconsideration levels of

19   administrative review.").  As such, there was no need for the ALJ to call an additional medical

20   expert to assist in his analysis of the medical record.  Similarly, the Appeals Council did not have

21   a duty to call an additional medical expert after receiving Plaintiff's supplementary evidence (AR

22   463-515), because none of this documentation conflicted with the evidence relied upon by the

23   State agency consultants.  *See* SSR 96-6p, at *4 (stating that the Appeals Council must obtain an

24   updated opinion from a medical expert only when additional evidence received "may change the

25   State agency medical . . . consultant's finding that the impairment[] is not equivalent in severity to

26   any impairment in the Listing of Impairments").  Finally, Plaintiff contends that the ALJ did not

27   adequately explain his decision that she meets or equals a listing impairment but "she does not

28   specify which listing she believes she meets or equals."  *See Burch*, 400 F.3d at 682-683 (holding

28

that a claimant failed to meet her burden to establish meeting or equaling a listing requirement for obesity when she presented no evidence in an effort to establish equivalence).

Thus, the Court concludes that the ALJ did not derogate his independent duty to fully and fairly develop the record. Substantial evidence supports the ALJ's analysis of Plaintiff's medical record, and the evidence was neither ambiguous nor inadequate to trigger a duty to explore Plaintiff's impairments any further.

> **2.      The Evidence Submitted to the Appeals Council Does not Alter the ALJ's Decision**

As noted above, Plaintiff submitted additional evidence after the ALJ's decision that the Appeals Council considered in denying Plaintiff's request for review. (AR 1, 4.) The Ninth Circuit requires district courts to consider additional evidence submitted to the Appeals Council to determine whether the record, as a whole, would change the ALJ's disability determination. *Brewes v. Commissionar of Social Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012) (awarding a claimant benefits after finding that additional evidence submitted to the Appeals Council after the ALJ rendered his decision would have led to a favorable decision had the evidence been available to the ALJ at the claimant's hearing). The Court has carefully considered the additional evidence Plaintiff submitted to the Appeals Council and finds that it does not undermine the ALJ's ultimate determination.

Plaintiff contends that "[t]he additional evidence submitted to the Appeals Council (Exhibit 10F, AR463 et seq.) establishes the significance of Plaintiff's abdominal pain, her attempts at following treatment and why certain treatment options were not warranted for her, and ongoing reports of head pain." Plaintiff's minimal contention, without supporting argument, is insufficient for purposes of review. *See Newett v. Colvin*, No. 13-03196, 2014 WL 4755564, at *4 (N.D. Cal. Sept. 24, 2014); *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (courts will not manufacture arguments for a party on review and instead "require contentions to be accompanied by reasons"). The additional evidence submitted to the Appeals Council is not inconsistent with the evidence presented to the ALJ and does not undermine the ALJ's disability determination. (Dkt. No. 13 4:20-5:18.) For example, the imaging report for a

United States District Court
Northern District of California

2012 CT scan of Plaintiff's pelvis and abdomen was unremarkable except for a stable fibroid. (AR 493.)  Likewise, a 2012 brain MRI report indicates "status post left pterional craniotomy with postoperative changes in the left temporal lobe including encephalomalacia and mild gliotic changes unchanged since the prior study.  No evidence of residual or recurrent meningioma." (AR 487-488.)  Finally, the opinion letters of Physician's Assistant McDonald are consistent with her previously offered opinions of Plaintiff's disabling symptoms which are predicated on Plaintiff's reports of pain, and as discussed above, such opinions were properly accorded no weight by the ALJ.  (AR 463-465.)

The Court has considered this additional evidence submitted to the Appeals Council and concludes that it does not alter its conclusion that the ALJ's decision finding Plaintiff not disabled is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED.  Judgment will be entered in Defendant's favor and against Plaintiff.

**IT IS SO ORDERED.**

Dated:  November 24, 2014

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge